**TIBOR MACHINE PRODUCTS, INC.,**
an Illinois Corporation, Plaintiff
and Counter–Defendant,

v.

**FREUDENBERG–NOK GENERAL
PARTNERSHIP,** Defendant
and Counter–Plaintiff.

No. 94 C 7635.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 19, 1996.

Michael Alan Weinberg, Eric Neal Macey, Patrick A. Fleming, Jennifer Lyn Friedes, Novack & Macey, Chicago, IL, for Tibor Machine Products, Inc., an Illinois corporation, plaintiff.

Robert P. Hurlbert, Louis Theros, Dickinson, Wright, Moon, Van Dusen & Freeman, Chicago, IL, Richard A. Wilhelm, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, for Freudenberg–Nok General Partnership.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiff Tibor Machine Products, Inc. ("Tibor") alleges claims for common law fraud (Count I), violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count II), promissory estoppel (Count III), and recoupment (Count V). Defendant Freudenberg–Nok General Partnership ("FNGP") moves to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated in this opinion, the motion is granted in part and denied in part.

## BACKGROUND [1]

Defendant FNGP manufactures, assembles and supplies parts and components to automobile manufacturers. Plaintiff Tibor machines component parts.

Nissan Motor Manufacturing Corporation U.S.A. asked FNGP to supply torsional vibration dampers for its VG–30, 6 Cylinder engine ("VG–30 Project"). FNGP asked Tibor to give it a price quotation to machine rings and hubs, two principal components of torsional vibration dampers for the VG–30 Project. Representatives of FNGP stated that if the quote were accepted, FNGP would purchase all of its required rings and hubs from Tibor for five years. FNGP needed an outside source because it did not have the ability to manufacture the parts in-house.

On April 10, 1992, Tibor submitted a quotation to FNGP for the machining of hubs and rings for the VG–30 Project for 120,000 to 150,000 hubs and rings per year at specific prices. FNGP selected Tibor to machine and supply those parts and submitted a written agreement on June 11, 1992, setting forth the material terms of the parties' agreement, including a provision that Tibor would be FNGP's exclusive supplier of hubs and rings for a period of five years. Tibor confirmed the terms of the agreement in a revised quotation submitted on June 22, 1992. FNGP then issued purchase orders to Tibor to manufacture sample rings and hubs. FNGP allegedly repeatedly assured Tibor

that it was finalizing the terms of the agreement, although no agreement was ever completed.

In March 1993, Tibor began to machine larger quantities of rings and hubs. One month earlier, FNGP's project manager allegedly directed Tibor to send him Tibor's confidential processing information. Tibor determined that its quoted prices to FNGP could not be maintained without investing in specialized automated equipment. It looked into purchasing highly automated and computerized equipment (the "Robotic Cell"). In May 1993, Tibor told FNGP that it could only justify investing in the Robotic Cell if FNGP would definitely purchase its rings and hubs for the VG–30 project exclusively from Tibor. FNGP allegedly represented that it would do so, failing to tell Tibor that in fact it intended to machine the parts in-house by the end of the year. FNGP reconfirmed its position at a meeting in June 1993, instructing Tibor to purchase the Robotic Cell.

In July 1993, FNGP sought assurances that the Robotic Cell would be installed and operational by September 1993, once again failing to inform Tibor that it was in the process of taking steps to bring the machining of rings and hubs for the VG–30 project in-house. One month later, FNGP allegedly falsely represented that it was finalizing the parties' written agreement, although this was never done. In October 1993, FNGP requested updated processing information from Tibor, which Tibor alleges FNGP was using to machine the parts in-house. Tibor also alleges that FNGP deliberately diverted certain raw materials used to produce rings and hubs called "castings," supposed to be delivered to Tibor, to FNGP's in-house facility. By November 1993, FNGP was seeking Nissan approval to machine the rings and hubs in-house.

Tibor has filed its fourth amended complaint. FNGP moves to dismiss claims for common law fraud (Count I), violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count II), promissory

---

1. Because we view the facts in the light most favorable to the nonmoving party, we set forth the background facts as stated in Tibor's complaint.

estoppel (Count III), and recoupment (Count V).

## DISCUSSION

Dismissal is properly granted only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1993) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). The court will accept all facts alleged in the complaint as true, drawing all reasonable inferences therefrom in favor of the plaintiff. *Jones v. General Electric Co.,* 87 F.3d 209, 211 (7th Cir.1996); *Wilson v. Formigoni,* 42 F.3d 1060, 1062 (7th Cir.1994).

### I. Common Law Fraud

■ The elements of an action for fraudulent misrepresentation are as follows: (1) the representation must be a statement of a material fact, rather than a mere promise or opinion; (2) the representation must be false; (3) the person making the statement must know or believe that the representation is false; (4) the person to whom the representation is made must reasonably rely on the truth of the statement; (5) the statement must have been made for the purpose of causing the other party to rely upon it; and (6) the reliance by the person to whom the statement was made led to his injury. *LaScola v. U.S. Sprint Communications,* 946 F.2d 559, 568 (7th Cir.1991).

### A. Fraudulent Scheme

■ It is well established under Illinois law that a plaintiff does not state a cause of action for fraud merely by alleging that the defendant had *no* intention to perform when the contract was made. *Ronco, Inc. v. Plastics, Inc.,* 539 F.Supp. 391, 395 n. 5 (N.D.Ill. 1982). A misrepresentation about an intention to act in the future, however, may be actionable if it is part of a "scheme employed to accomplish the fraud." *Ault v. C.C. Services, Inc.,* 232 Ill.App.3d 269, 173 Ill.Dec. 746, 749, 597 N.E.2d 720, 723 (1992). The case of *Roda v. Berko,* 401 Ill. 335, 81 N.E.2d 912 (1948), illustrates a scheme to defraud. In that case, Berko induced Roda to sell him a tract of land by promising to build a factory on the land. Instead, he intended to, and in fact did, lease the land to a third party for use as a junkyard which decreased the value of Roda's adjacent property. Berko knew that if he revealed his actual intention to use the land as a junkyard, Roda would not have agreed to the sale. The false representation, although pertaining to a future event, was actionable fraud because it was part of a scheme or device "used to cheat ... another of his property." *Roda,* 81 N.E.2d at 915.

■ FNGP argues that Tibor has failed to allege the existence of a fraudulent scheme. It maintains that while Tibor has stated that FNGP engaged in a fraudulent scheme, it has failed to point to any "objective manifestations of a fraudulent intent." *See Industrial Specialty Chemicals, Inc. v. Cummins Engine Co. Inc.,* 902 F.Supp. 805, 813 (N.D.Ill.1995). FNGP contends that Tibor's mere statements that a fraudulent scheme existed do not transform Tibor's claims for recovery on the basis of an alleged future promise into one based on misrepresentation of existing fact.

FNGP relies on *Industrial Specialty* in support of its argument. The plaintiff in that case alleged that defendant orally promised that if plaintiff were successful in developing certain chemicals, defendant would purchase a certain amount of the chemicals annually. *Id.* at 808. The court granted the motion to dismiss based on the fact that "plaintiff bases its fraud claim solely on the ground that defendants' alleged promise of future purchases never came to fruition." *Id.* at 813. The court stated: "Because a claim for fraud for an alleged misrepresentation of future conduct cannot be grounded solely on the broken promise itself, we must grant defendants' motion to dismiss." *Id.* (citations omitted).

FNGP maintains that Tibor's allegations do not support its claim that it was fraudulently induced to purchase equipment on the promise of a five year contract. FNGP states that the following admitted facts contradict an allegation of a fraudulent scheme: (1) Tibor had the capacity and knowledge to machine hubs and rings pursuant to FNGP's

needs and specifications in September 1991; (2) Tibor submitted a proposal which contained representations that it could meet the requirements at a specified price in April 1992; (3) Tibor realized in March of 1993 it could not meet price and quantity quotes given a year earlier without the purchase of specialized equipment; (4) Tibor accepted a purchase order in April 1993 containing terms materially different from a five year contract; (5) Tibor purchased the Robotic Cell in June of 1993 to meet the requirements of the April 1993 purchase order.[2]

We disagree. Even accepting that FNGP has fairly characterized these allegations, the complaint does not contradict the existence of a fraudulent scheme. All of the facts emphasized by FNGP pertain to Tibor's conduct during the parties' relationship. They fail to detract from Tibor's allegations concerning FNGP's conduct. We believe that Tibor has alleged sufficient facts to support its contention that FNGP purposefully lured Tibor into believing that it wanted Tibor to produce the rings and hubs necessary for its VG–30 Project, when it actually intended to purchase the parts from Tibor only until its own in-house production was fully operational, planning to use Tibor's initial production to its own advantage.

Tibor alleges the following, demonstrating the existence of a fraudulent scheme: (1) FNGP repeatedly told Tibor that it did not have the capacity to machine the rings and hubs for the VG–30 project in-house; (2) FNGP represented that it was finalizing a proposed written agreement submitted by Tibor when, in fact, it never intended to complete or sign the agreement; (3) FNGP's product manager instructed Tibor to send him confidential processing information, failing to disclose that FNGP was planning to machine the rings and hubs in-house and would use the information to develop its in-house machining processes; (4) FNGP failed to inform Tibor that it was in the process of taking steps to machine the rings and hubs for the VG–30 Project in-house; (5) FNGP repeatedly assured Tibor that it would purchase hubs and rings in a specific quantity over the next five years for the VG–30 Project; (6) FNGP purposefully diverted castings orders by secretly informing the supplier to ship the castings to FNGP instead of to Tibor.[3]

■ Tibor alleges the following, demonstrating fraudulent intent: (1) FNGP needed Tibor to machine the rings and hubs for the VG–30 Project until it could more efficiently and economically machine them in-house; (2) FNGP intended to use Tibor as a guinea pig to invest the time, labor, and funds necessary to engineer the processing of the rings and hubs to Nissan's particular specifications; (3) FNGP intended to misappropriate Tibor's confidential information to facilitate its own machining of the rings and hubs in-house.[4] We believe these allegations adequately support the existence of a fraudulent scheme.

2. Tibor objects to these statements as distorting the allegations in the complaint. Because we are not persuaded that these statements contradict the allegations concerning the existence of a fraudulent scheme, we need not address whether FNGP has misstated the facts as alleged in the complaint.

3. FNGP also argues that some of Tibor's allegations are not credible, namely FNGP was working to set up its own in-house production during the entire three year period after it initially approached Tibor. FNGP points out that this allegation is especially unbelievable in light of Tibor's allegations that FNGP had knowledge concerning the equipment needed to manufacture hubs and rings for the VG–30 Project and that it was already involved in manufacturing smaller hubs and rings. However, at this stage of the case, it is neither necessary nor appropriate to attempt to determine whether the facts alleged by plaintiff are true. The question on a Rule 12(b)(6) motion to dismiss is whether the complaint, on its face, fails to state a claim for which relief can be granted.

4. FNGP argues that Tibor contradicts itself. FNGP maintains that Tibor's statement that FNGP used Tibor as a guinea pig because it was unable to perform the Nissan contract on its own contradicts Tibor's allegation that FNGP actually had the capacity to manufacture the hubs and rings in-house but represented otherwise. We do not see these statements as entirely contradictory. Based on our reading of the complaint, we understand Tibor to allege that, at the time FNGP initially sought Tibor's services, it did not have the capacity to manufacture the rings and hubs in-house, but that it was planning to set up its own in-house production and anticipated using Tibor to produce the parts until its own in-house production was functional.

## B. Reasonable Reliance

■ FNGP also argues that Tibor cannot be said to have reasonably relied on an alleged promise of a five year contract. FNGP issued a blanket purchase order on April 20, 1993, stating that it was a "BLANKET ORDER VALID THROUGH 1996 MODEL YEAR AT FNGP DISCRETION." FNGP relies on *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.*, 913 F.Supp. 1088 (N.D.Ill.1995), which held that there was no justified reliance on an oral promise when that previous or subsequent oral promise contradicts an admitted written executory agreement. *Id.* at 1144. FNGP asks us to go outside the pleadings and consider the purchase order. Under Rule 12(b), if documents outside the pleadings are relied on by the movant, the court must convert the 12(b)(6) motion to one for summary judgment and afford the plaintiff an opportunity to submit additional evidentiary material of its own. *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir.1993). However, this is not required if the documents are referred to in the plaintiff's complaint and are central to its claim. *Id.*

In *Venture Associates*, the Seventh Circuit upheld the district court's decision to consider the documents and still treat the defendant's motion as one for dismissal for failure to state a claim rather than one for summary judgment. *Id.* at 432. In that case, the documents consisted of the plaintiff's proposed letter of intent and related letters by which the parties agreed to be bound by the terms of the defendant's offer to sell. *Id.* at 431. All of these documents were referred to in the plaintiff's complaint, and the court found that they were central to the plaintiff's claim as they "constitute[d] the core of the parties' contractual relationship." *Id.* at 431–32. *See also Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (finding that district court properly

considered copy of agreement entered into between parties where plaintiff repeatedly quoted from and referred to document in his complaint and that agreement was key component of plaintiff's claims).

■ Our case is distinguishable. First, Tibor never referred to the April 1993 purchase order in its complaint.[5] Second, we do not believe the purchase order is central to Tibor's claims. The complaint refers to many promises defining the parties' relationship. We cannot say with certainty that Tibor's shipments of hubs and rings were done pursuant to this purchase order, especially since the purchase order itself only refers to rings. There is no evidence that this purchase order was *the* document that established an agreement between the parties. Furthermore, we deny defendant's alternative request to consider the purchase order in any event, converting its motion to a Rule 56 motion for summary judgment. Because we see no reason to consider the April 1993 purchase order in addition to the complaint itself, we exclude the document from our review. Accordingly, we ignore the purchase order in deciding the 12(b)(6) motion and find that Tibor has sufficiently stated that it reasonably relied on FNGP's alleged misrepresentations.

## II. Illinois Consumer Fraud and Deceptive Business Practices Act

■ The Illinois Consumer Fraud and Deceptive Business Practices Act ("the Act") provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... are

---

**5.** Tibor does refer in its complaint to FNGP's "specific requests in March and April 1993." However, we do not believe this singular reference is analogous to the kind of repetition noted in *Venture Associates*. Furthermore, we are not persuaded that this even refers specifically to the April 1993 purchase order. First, the "requests"

mentioned might not necessarily be the purchase order: Tibor could be referring to oral requests. Second, the fact that the complaint mentions requests made "in March and April" undercuts FNGP's argument that, by that statement, Tibor was referring to one particular purchase order.

hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS § 505/2. In order to prove a violation of the Act, a plaintiff must prove that the defendant: (1) engaged in a deceptive act or practice; (2) intended that the plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce. *Siegel v. Levy Organization Development Co., Inc.,* 153 Ill.2d 534, 180 Ill.Dec. 300, 304, 607 N.E.2d 194, 198 (1992). Actual reliance is not required. *Id.*

 FNGP argues that we should dismiss Count II because Tibor has failed to allege a nexus between the complained of conduct and consumer protection concerns. FNGP argues that general injury to consumers is a requirement under the Act where a dispute involves two businesses. The Act provides: "Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person.... Proof of a public injury, a pattern, or an effect on consumers generally shall not be required." 815 ILCS § 505/10a.[6] Not only does the Act clearly state that injury to consumers is not required, but the Seventh Circuit has held that the 1990 amendments (which added the relevant language) merely clarified the statute as it existed prior to the amendments. *Hardin, Rodriguez & Boivin v. Paradigm Ins.,* 962 F.2d 628, 637–38 (7th Cir.1992) (finding that trial court's instruction failing to state that injury to consumers generally was a required element under the Act in suit brought by plaintiff, a professional corporation providing anesthesiological services to hospitals, against defendant, an insurance company, was proper). This court has previously stated that allegations of public injury are not— and never were—required. *Wilcox v. Incandela,* 1993 WL 436376 at *6 (N.D.Ill. Oct.

26, 1993).[7] FNGP argues, however, that the 1990 amendment does not apply when the litigation involves businesses rather than individuals.

In support of its argument, FNGP relies primarily on two cases decided in this district. In those cases, the courts held that a business bringing a claim under the Act must allege the necessary nexus between the complained of conduct and consumer protection concerns. *See Industrial Specialty,* 902 F.Supp. at 812 (Aspen, J.) (holding that failure to allege a nexus between the complained of conduct and consumer protection concerns rendered the business's claim insufficient under the Act); *Scarsdale Builders, Inc. v. Ryland Group, Inc.,* 911 F.Supp. 337, 340 (N.D.Ill.1996).

In *Scarsdale Builders,* Judge Shadur undertook an extensive analysis of the question of whether, where the litigation involves two businesses, injury to consumers in general is required. Judge Shadur noted the language of the 1990 amendment declaring that proof of a public injury is not required but stated: "[T]he cases since that amendment have nevertheless continued to limit the availability of the Act in [disputes between businesses]." *Scarsdale Builders,* 911 F.Supp. at 340, *see e.g. Lake County Grading Co. of Libertyville Inc. v. Advance Mechanical Contractors, Inc.,* 275 Ill.App.3d 452, 211 Ill.Dec. 299, 654 N.E.2d 1109 (1995).

In *Lake County Grading,* the Illinois Appellate Court determined that the 1990 amendment does not apply to every commercial transaction regardless of the relationship between the parties, stating: " '[I]f litigants could invoke the Act merely by alleging an intentional or fraudulent breach of a contract, common-law breach of contract actions would be supplemented in every case with an additional and redundant remedy under the Act.' " *Scarsdale Builders,* 911 F.Supp. at

---

**6.** The term "person" includes any "company" or "business entity or association." *See* 815 ILCS 505/1(c). "The title of the Act suggests that it is designed to 'protect consumers and borrowers and *businessmen* against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' " *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 749 F.Supp. 869 (N.D.Ill.1990).

**7.** We recognize, as FNGP points out, that *Wilcox v. Incandela* involved individuals rather than businesses and therefore would not fall within the alleged business exception to the general consumer injury requirement under the Act.

340 (quoting *Lake County Grading*, 211 Ill. Dec. at 305–06, 654 N.E.2d at 1115–16). *Scarsdale Builders* reasoned that "the federal courts' role in diversity of citizenship cases is simply to conform to state law, including the state courts' reading of state statutes. And although the Illinois Supreme Court has not had occasion to speak to the subject, the overriding message from the intermediate appellate courts is exceedingly plain." *Id.* at 341.

We respectfully decline to follow *Scarsdale Builders,* finding that the message from the Illinois intermediate appellate courts is not as clear as that case suggests. For example, in *Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.,* 214 Ill.App.3d 1073, 158 Ill.Dec. 185, 573 N.E.2d 1370 (1991), a nursing home's former pharmacy provider brought an action against several owners and providers challenging an alleged kickback scheme involving the sale of drugs to nursing home residents. *Id.,* 158 Ill.Dec. at 187, 573 N.E.2d at 1372. The court found that the plaintiff, a business, need not show that the defendants' conduct resulted in public injury in order to maintain a claim under the Act. *Id.,* 158 Ill.Dec. at 193, 573 N.E.2d at 1378.[8]

Furthermore, other courts in this district have recognized the confusion in this area. In *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 749 F.Supp. 869 (N.D.Ill. 1990), a case involving two businesses, Judge Aspen recognized that "the case law is split on the issue of whether it is necessary to allege public injury or injury to consumers generally." *Id.* at 878. The court found that "the question is not sufficiently settled to justify dismissing [the plaintiff's] claims on those grounds" and noted that the 1990 amendment "might suggest that no such requirement was ever intended." *Id.*[9]

Since the Illinois Supreme Court has not yet spoken on the issue and the intermediate appellate courts have not provided clear direction on how the highest state court would rule, we are inclined to follow the plain language of the Act itself. In the face of such an apparently clear attempt by the Illinois legislature to clarify that general injury to consumers is not required, and in the absence of any indication that it intended to restrict the amendment to actions brought by individuals only, we will follow the statutory language. Accordingly, we hold that Tibor need not allege injury to consumers generally in order to bring a claim under the Act and will not dismiss Count II.

### III. Promissory Estoppel

■■■■ To state a claim for promissory estoppel in Illinois, a plaintiff must establish that he reasonably and justifiably relied to his detriment on an unambiguous promise and that such reliance was foreseeable by the promisor. *See M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1408 (7th Cir. 1991). "[P]romissory estoppel is a method to enforce promises that do not meet the requirements of consideration." *Prentice v. UDC Advisory Services, Inc.,* 271 Ill.App.3d 505, 207 Ill.Dec. 690, 695, 648 N.E.2d 146, 151 (1995). "[O]nce consideration is found to exist, a party to the contract can no longer maintain an action for promissory estoppel where the performance which is said to satisfy the requirement of detrimental reliance is the same performance which supplies the consideration for the contract." *Id.* A party may plead claims for breach of contract and promissory estoppel in the alternative. *Id.,* 207 Ill.Dec. at 694, 648 N.E.2d at 150. " '[T]o the extent that (plaintiff) ultimately will not be able to prevail under both theories of recovery, it need not embrace one over the other at this earlier stage of the proceedings.' " *Id.* (quoting *Jackson National Life Ins. Co. v. Gofen & Glossberg, Inc.,*

---

**8.** We note that the court recognized that "[i]n any case, evidence of public injury was presented." *Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.,* 214 Ill.App.3d 1073, 158 Ill.Dec. 185, 193, 573 N.E.2d 1370, 1378 (1991). However, this does not alter the fact that, in a case involving two businesses, the appellate court clearly stated that proof of injury was not required.

**9.** We note that in a later opinion, *Industrial Specialty* (relied on by FNGP), Judge Aspen held that the plaintiff had failed to state a claim under the Act because it had not established a nexus between the complained of conduct and consumers generally.

1993 WL 266548 at *3 (N.D.Ill. July 15, 1993)).

FNGP argues that we should dismiss Count III because there was an existing enforceable contract between the parties, precluding reliance on the doctrine of promissory estoppel. We disagree. The complaint does not demonstrate that the parties entered into any enforceable contract.

Tibor alleges the existence of another document which, if executed, would have governed the parties' relationship. Tibor alleges that it submitted an agreement to FNGP in June 1992, titled "Supplemental Purchase Terms and Conditions" which set forth the material terms of the parties' agreement. Tibor states that on several occasions FNGP gave false assurances that it was finalizing the agreement, but that the agreement was never completed and signed. As we have not determined what, if any, contract governed the parties' relationship, we certainly cannot say that Tibor's expenditures provided the consideration for such a contract and therefore preclude a claim for promissory estoppel based on those same expenditures.[10]

Furthermore, even if we were able to ascertain that a contract existed and what that contract was, the absence of fully detailed terms would also discourage dismissing the promissory estoppel claims. We confronted that exact issue in *Trans American Airlines, Inc. v. British Aerospace Holdings, Inc.*, 1996 WL 465391 (N.D.Ill. Aug. 8, 1996), where the defendant argued that plaintiff's claim for breach of contract rendered its claim for promissory estoppel superfluous.

Rejecting that argument, we stated: "[T]he terms of the contract at issue here are yet to be determined. The only thing that has been established so far in this case is that both parties agree there is a contract between them. Since it is not true here that 'each and every term was [unambiguously] spelled out in black and white in the contract,' we need not be concerned, as the *Prentice* and *Wagner* courts were, that in bringing its alternative estoppel claims plaintiff is simply trying to get a second or third 'bite at the apple in the event it fails to prove breach of contract.' " *Id.* at *4 (quoting *Wagner Excello Foods v. Fearn Intern., Inc.*, 235 Ill. App.3d 224, 176 Ill.Dec. 258, 267, 601 N.E.2d 956, 965 (1992)).

The situation here presents an even stronger case for upholding the promissory estoppel claim. In *Trans American,* the plaintiff brought a breach of contract claim in addition to its promissory estoppel claim. Furthermore, there was no question that the parties had entered into a written agreement governing the relationship. Rather, the questions concerned the numerous ambiguous provisions in the contract. Here, Tibor has not brought a claim for breach of contract in its fourth amended complaint. Additionally, it is not even certain that a contract existed between the parties, much less what the provisions of such a contract were.

Tibor claims that it detrimentally relied on FNGP's promise to purchase rings and hubs for a period of five years. In reliance on that promise, Tibor allegedly incurred expenses and made investments, including the pur-

---

**10.** Cases cited by FNGP are distinguishable. In *LaSalle National Bank v. Metropolitan Life Ins. Co.*, 1993 WL 191803, at *4 (N.D.Ill. June 4, 1993) (Grady, J.), aff'd, 18 F.3d 1371 (7th Cir. 1994), the plaintiffs "admit[ted] that the promise forming the basis of the promissory estoppel claim [was] contained in the written loan commitment." In that case, we dismissed the claim for promissory estoppel because we found that the parties had entered into a binding contract. *Id.* Likewise, in *Wagner Excello Foods v. Fearn Intern., Inc.*, 235 Ill.App.3d 224, 176 Ill.Dec. 258, 266, 601 N.E.2d 956, 964 (1992), the plaintiff alleged that the parties had entered into an initial agreement and, subsequently, a revised agreement, and the court found that the plaintiff had pleaded a valid contract. Furthermore, in both *LaSalle* and *Wagner* the plaintiffs brought a claim

for breach of contract in addition to their promissory estoppel claims. In *Prentice v. UDC Advisory Services, Inc.*, 271 Ill.App.3d 505, 207 Ill. Dec. 690, 693, 648 N.E.2d 146, 149 (1995), in addition to bringing a claim under promissory estoppel, plaintiffs also brought a claim for breach of contract against defendants for failing to abide by the terms of written offering materials, Subscription Agreement, Articles of Limited Partnership, and oral representations. Plaintiffs' promissory estoppel counts repeated the allegations of the breach of contract counts. *Id.* The court held that "plaintiffs' execution of the Subscription Agreements and the tendering of capital could never be deemed 'detrimental reliance' because plaintiffs were already obligated to provide that same performance under the contract." *Id.* 207 Ill.Dec. at 695–96, 648 N.E.2d at 151–52.

chase of the Robotic Cell and related equipment that was designed exclusively for machining the hubs and rings that were to be sold to FNGP. FNGP has failed to demonstrate that there was any valid contract under which Tibor was obliged to provide that same performance. Accordingly, we will not dismiss Count III.

### IV. Recoupment

■ The doctrine of equitable recoupment applies when a contract is terminated without just cause before a party has a chance to recoup its investment. *Cox v. Doctor's Associates, Inc.*, 245 Ill.App.3d 186, 184 Ill.Dec. 714, 724, 613 N.E.2d 1306, 1316 (1993).[11]

■ Relying on *Cox*, FNGP argues that in order to establish a recoupment claim, the plaintiff must allege the following: (1) a contract terminable at will; (2) that was terminated without just cause; and (3) substantial unrecovered expenses incurred by the plaintiff due to the termination. Tibor argues that only one element is required: termination without just cause. In support of its argument, Tibor points out that the court in *Cox* stated that the "one significant factor underlying claims for equitable recoupment" is that "the termination of the working relationship was *without just cause.*" *Id.*, 184 Ill.Dec. at 724, 613 N.E.2d at 1316. However, we doubt that a claim for recoupment could stand in the absence of any contract. We do not believe that Tibor has sufficiently alleged the existence of a contract and therefore dismiss this claim with leave to amend to include allegations of what, if any, contract Tibor believes FNGP terminated without just cause.

FNGP advances two additional arguments which we believe have no merit. FNGP maintains that Tibor cannot maintain a claim for recoupment because Tibor was not required to make the investments it attempts to recoup. In *Nichols Motorcycle*

*Supply*, the court found that the equitable recoupment claim failed where, although plaintiff alleged that it made substantial investments, there was no evidence that defendant "required" plaintiff to make such investments; therefore, defendant was not responsible for investments not recouped due to plaintiff's termination. 913 F.Supp. at 1142–43. The complaint merely stated that the defendant "encouraged" the expenditures. *Id.* at 1143. Contrary to the plaintiff in *Nichols Motorcycle Supply*, Tibor clearly alleges that FNGP "required" the investments it seeks to recoup. It states that: (1) the FNGP representatives "instructed Tibor to order the Robotic Cell" and (2) that they called "to confirm that Tibor had ordered the Robotic Cell." Thus, we will not dismiss Tibor's recoupment claim for failure to allege that FNGP required the expenditures.

■ Lastly, FNGP argues that Tibor's claim for recoupment fails because it is devoid of allegations of an agency relationship. We do not believe that the existence of an agency relationship is a condition precedent to a claim for recoupment. In support of its argument, FNGP cites *Dupage Fork Lift Service, Inc. v. Machinery Distribution, Inc.*, 1995 WL 125774 (N.D.Ill. March 14, 1995). In that case, the plaintiff attempted to base its breach of contract action "on the franchisor's termination prior to franchisee's recoupment of investment." *Id.* at *12. The court dismissed the claim, finding that plaintiff had "not asserted a cause of action based on agency, but rather is suing for damages of a contractual nature based on the parties' contractual arrangement." *Id.* at *13. However, unlike the plaintiff in *Dupage Fork Lift*, Tibor is not attempting to bring a claim for breach of contract under a theory of recoupment. Furthermore, we do not read *Dupage Fork Lift* to stand for the proposition that an agency relationship is a necessary component of a recoupment claim.[12] Thus, we will not

**11.** Contrary to FNGP's initial assertion, courts have not treated the doctrine of equitable recoupment as a purely defensive matter. *See Cox v. Doctor's Associates, Inc.*, 245 Ill.App.3d 186, 184 Ill.Dec. 714, 725, 613 N.E.2d 1306, 1315 (1993).

**12.** FNGP also cites *P.S. & E., Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125 (7th Cir.1972), and *Mechanical Rubber & Supply Co. v. American Saw & Manufacturing Co.*, 810 F.Supp. 986 (C.D.Ill.1990). In both of these cases, the court considered whether, in a case involving a con-

dismiss Tibor's recoupment claim for failure to allege an agency relationship.

## CONCLUSION

For the forgoing reasons, defendant's motion to dismiss is denied as to Counts I, II, and III. Defendant's motion is granted as to Count V with leave to amend to allege the contract plaintiff believes was terminated without just cause.

tract terminable at will, a plaintiff might recoup its investment. These cases stand for the proposition that absent an agency relationship, a plaintiff may not recover expenses incurred on a breach of contract claim where the agreement was not for a specific duration. *See Selastomer*, 470 F.2d at 128; *Mechanical Rubber*, 810 F.Supp. at 995. If the contract between Tibor and FNGP, assuming one exists, was for a specific duration, these cases would not apply.